Milligan, J.,
delivered the opinion of the court:
This is a claim for $141,875, presented in this court by Matthew Baird, as surviving partner of the firm of “M. W. Baldwin & Co.,” locomotive builders, in the city of Philadelphia. The claim rests on contract, which is embodied in the following correspondence :
“ Office of Director and General MaNAgker
‘‘Military Railroads United States,
“ New York, March 19, [17,] 1864.
“ Gentlemen : In pursuance of the authority in me vested, I do hereby direct you to construct, at the earliest practical period, fifteen locomotive engines, of five feet gauge, for the use of the United States Government, to the exclusion of all other interests or. contracts whatever; it being understood that you will be indemnified for any damage resulting from a compliance with this order. In replacing any engines taken from other parties in filling this order, you are authorized to charge the Government any advance in materials and labor over the cost of these on the 9th of November, 1863, this being the date of a certain contract made by you with the Louisville and Frankfort and Lexington and Frankfort Railroad Companies, upon which the value of the fifteen locomotives above referred to was based.
“D. 0. McOALLUM,
“ Colonel, Director and General Manager
“ Military Railroads United States.
“Messrs. M. W. Baldwin & Co.,
“ Philadelphia.”
*355 “Philadelphia, March 17,1864.
“ Ste : In compliance with your order of tbis date, we will furnish, the United States fifteen locomotive engines, with cylinders 16 by 24; four driving wheels, 5 feet diameter; one hundred and fifty-three copper flues, 11 feet long and 2 inches diameter, two pumps, and one No. 5 injector. Tenders of 1,800 gallons capacity, on two trucks, eight wheels, same as Pennsylvania Railroad standard gauge, 5 feet. The whole number to have precedence of all other work whatever, and to be finished with all possible dispatch. For which we are to-receive on delivery the sum of $18,947 72 [and for each engine], and government tax.
“ This price is based upon a contract made with the Louisville and Frankfort and Lexington and Frankfort Railroads, on the 9th of November, 1865.
“M. W. BALDWIN & CO.
“ Colonel D. C. McOalltoi,

“Director and General Manager

“Military Railroads United States.

“The above is hereby accepted.
“D. C. McCALLUM,
“ Colonel, Director and General Manager

“Military Railroads United StatesP

On the 22d of the same month, Secretary Stanton wrote Baldwin & Co., confirming the authority of Colonel McOallum to contract, and stating that the engines were required for immediate use, in order to meet the wants of the military department of the government then operating in Tennessee.
At the time this demand was made and the contract closed, the house of Baldwin & Co. was under contracts with twenty-six railroad companies to build and deliver about ninety-eight locomotive engines; of this'number, eighteen were finished for private parties while the government work was in progress; and of the remaining eighty engines, thirty-tioo were at fixed prices, and forty-eight at prices in accordance with the cost of labor and material at the date of delivery. The government work was begun on the 17th of March, 1864, and all private orders postponed, except on the eighteen engines finished during its progress. The work on the eighty engines previously ordered *356 by private parties is shown, to have been delayed about two months, and the first engine on the government order to have been delivered on the 3d of May, and the last on the 30th of June, 1864.
At the date of the government contract the firm had on hand about $400,000 worth of material, which, as far as practicable, was employed in building the government engines. But during the time the work was in progress the prices of material and labor were constantly rising. One of the witnesses, who has been for ten years past a' dealer in all kinds of materials which enter into the construction of locomotives, testifies that “from and after the 9th of November, 1863, the rise was steady and rapid until July 1864; after that time, and up to the 1st of December, 1864, prices of all kinds of materials remained about the same as they were in the month of July 1864; wages rose continually up to the month of December 1864, from the 9th of November, 1863. The average rise of materials from the 9th of November, 1863, to the 1st of May, 1864, was 54 per cent.; from the same date to the 1st of June, 1864, it was 58 per cent.; the same to the 1st of July, 1864, the rise was 86| per cent. Labor rose from the 9th of November, 1863, to the 1st of May, 1864, 23 per cent., and from the same date to the 1st of June, 1864, wages rose 26 per cent., and from the same date to the 1st of July, 1864,27 per cent., and from the 1st of July, 1864, to the 1st of December, wages rose over and above the July prices 25 per cent/' .
The cost of a locomotive engine is shown to be made up of three-fifths material and two-fifths labor.
It' further appears, if the construction of the government engines had been delayed till the execution of prior orders, the fifteen engines ordered for the government on the 17th of March, 1864, would have been.delivered, according to the regular course of business in the manufactory, from the 21st of November, 1864, to tbe 30th of December following; whereas the work was begun on the 17th of March, and the whole fifteen engines actually delivered between the 3d of May and the 30th of June, 1864.
It further appears, as the engines were completed they were charged up to the United States, in sections of five, at the in *357 creased average price of labor and material employed in their construction at the date of their delivery, viz.:
For the first five, each engine. $26,034 19
For the second five, each engine. 26,716 31
For the third five, each engine..29,747 96
The whole sum at the above prices charged on the firm books amounts to $412,492 30.
The most of the materials out of which the government engines were built, had been pmrchased previous to the contract on orders for private parties; but it is shown by claimant’s own witnesses, in making up the average price on the government engines in sections of five each, the calculations were based on the increase of the price of labor, and what it would actually cost to replace the materials used.
Bills thus made out, as the work progressed in sections, were presented for payment, and the contract price, $18,947 72, plus 3 per cent, government tax, was promptly paid as the engines were delivered, leaving the question of damages for future consideration and adjustment when the whole should, be'delivered. The sum paid, including the excise tax due on the contract price, was $292,742 25, which was subsequently advanced by the Department on account of the increase of the price in labor and material, interest, &c., $97,507 75, making the whole sum allowed and paid by the government, $390,250.
After the receipt of this sum, the claimant, not being satis-' fied on the ground of indemnity claimed under the contract, presented his application to the Department for further allowance and indemnity, and this application was referred by the Secretary of War to a board of officers detailed by him to settle and adjust such claims, who, after full consideration, rejected it. And now this action is brought on the ground, as shown in the petition, “that the allowances do not embrace any compensation or indemnification for the postponement of private orders, although, in fact, by the postponement of such private orders, in compliance with Colonel McOallum’s order, your petitioner’s firm incurred an increased expense in filling said private orders to the amount of $111,875, owing to the rise of materials and labor during the time when the execution thereof was postponed to build the engines for the United States; and no part
*358 of such increased cost was paid either by the United States, or by the parties for whom the engines were constructed.”
Added to this sum of $111,875 claimed as indemnity, the petitioner claims as further indemnity, under the stipulations of the contract, “whether calculated by way of interest or otherwise ascertained,” the sum of $30,000, whicli makes the total sum $111,875.
On this state of facts, it will be observed that in the printed brief of the claimant’s counsel, $38,617 06 are claimed as abalance still due on the engines, and the remainder is claimed in the petition on account of losses resulting from the postponement of other work previously contracted, laying out of capi-ital, &c. To the first ground of complaint made in the argument, the Assistant Attorney General for the United States interposes the objection, that nq claim for money due on the contract prices of the engines is made in the petition, and, therefore, no recovery can be had on that ground.
In the case of Brown vs. The United States, (1 C. Cls. R., 377,) this court held that there could be no recovery on grounds presented in argument, but not set forth in the petition as a ground of complaint, or the foundation of a judgment. The rule is strictly sound, and when applied to this case cuts off the $38,617 .06 claimed in the argument as a balance due on the engines. It is nowhere alleged in the petition that this sum, or any other, is due, under the contract, on the price of the engines. On the contrary, it is plainly deducible from the whole body of the petition, that the prices and allowances due on this ground have been paid and satisfied. The complaint set forth in the petition is rested on the grounds of indemnity, and we can consider no other.
In this view of the case, we need only recur to the written contract of the parties, which, although somewhat inartificially drawn, contains all the elements essential to the agreement- of the parties without the aid of extrinsic evidence.
The engines were required for the immediate use of the Army operating in Tennessee, and to meet this necessity, which admitted of no delay, General McCallum, as the agent of the government, ordered the claimant’s firm to build fifteen engines, “to the exclusion of all other interests or contracts whatever;” and in consideration of this extraordinary demand, he bound *359 tbe Government to indemnify the claimant’s house “for any damages resulting from a compliance with this order.”
Beyond this stipulation in the contract, the price agreed on for each engine was contingent, and in a great degree dependent on the prices of labor and material ruling at the date of delivery. No other just rule of compensation could have been adopted, for prices both of labor and material at that time bore no fixed rate. Both were rising so rapidly that neither could be commanded for any considerable time at a fixed and uniform standard; and to obviate this difficulty, the parties agreed on the sum of $18,947 72, plus the excise tax, increased by the advanced cost of labor and materials employed on each engine. The language of the contract is, “In replacing any engines ■taken from other parties in filling this order, you are authorized to charge the government any advance in the cost of materials and labor over the cost of these on the 9th of November, 1863.”
Baldwin & Có. had on hand no engines similar to those required by the government, and consequently none were turned over in fulfillment of this contract; but the materials then on hand were largely used in constructing the government engines, which, with the increased cost of labor, have been estimated on the basis of the contract, and paid for by the government.
It only remains, therefore, in this application, to estimate the damages which accrued to the claimant by the postponement of the private orders which were in advance of the government order. And what are these damages, and by what rule must they be measured 1 The proof shows that at the date of the contract, the house had ninety-eight orders in advance of the gov- . eminent order. Of this number eighteen were completed while the- contract under consideration was being fulfilled; and of the remaining eighty, thirty-two were at fixed prices, imdfoHy-eight at contingent prices.
In this state of the business of the house, the government engines were built, under the order of Colonel McCallum, in advance of the eighty engines previously ordered by private parties, which pressed them forward to a period in which the cost of labor and materials were much higher than if they had been built in the order of time in which they stood on the claimant’s order book.
The proof shows that had the government engines taken their *360 place on the order boob, and been built in tbe order of time in which they then stood, they would have been delivered between the 21st of November and the 30th December, 1864, whereas they were actually delivered between the 3d of May and the 30th of June, 1864.
It is also shown in the proof that the work on the private orders was postponed, in consequence of the intervening order' of the government, about two months.
No specific damages are proved, or actual loss on any engine shown, except as it is derived from the rise of labor and material, the latter of which appears to have reached its highest point of advance in July 1864, while the former continued to rise till near the close of the year. If is therefore obvious that no very accurate rule of damages can be deduced from such facts. But the claimant has presented the sum of $1,250 as the average increase of labor and material, which entered into the construction of locomotive engines per 60 days, (per 2 months,) in the latter part of 1864, which, we think, more nearly approximates the true rule of damages than any other we can apply to this case. But this rule cannot in justice be applied to the whole eighty engines postponed by the execution of the government order; for it is plain, had the government not interfered at all, the Messrs. Baldwin & Co. could not have all at once built the eighty engines that they had under private contract. They could have only built fifteen in the time they lost in building ■the government engines.
On this .hypothesis the whole eighty private engines would have remained unfinished after the government work was done;, but sixty-five of them, it is to be presumed, would have been finished in the same time .it would have required to finish the whole, had the government order not been interposed, leaving only fifteen which • were, in fact, pushed over into a period of higher infices.
On these fifteen engines, which in point of fact were built after the whole eighty would have been delivered, had there been no interference, it is just the claimant should recover damages.
The rule by which his damages ought to be measured, as before shown, must of necessity be a rule of approximation. Absolute accuracy is scarcely attainable; for it cannot' be overlooked that of the eighty engines under private contract,. *361 only thirty-two were at fixed prices, and all the rest at contingent rates. On the latter, it is manifest, from the proof, little or nothing', except in very few instances, was lost on th^ir delivery.
'Besides, the rise in materials is proved to have reached the highest point of advance about the date on which the government engines were completed an-d delivered, and it is shown that they were built from materials previously laid in at lower rates by the firm, while the government engines were charged up and paid for at the advanced rates. The government engines did not consume all the $400,000 worth of materials previously laid in by the Messrs. Baldwin & Go., and that which remained over, as of course, rose in value with the advancing prices of the times, and necessarily contributed largely to their profits on all the private engines paid for at contingent rates.
In view of the whole case, we are unable to adopt any rule of damages which, under the peculiar facts of this case, more nearly approximates the justice of it, than to allow the claimant the sum of $1,250 on each engine showrn by himself, as the average advance of labor and material about the period when the last fifteen engines on private contracts were built, and such other losses actually shown to have been sustained in settlements with private contractors in consequence of this order.
Under this rule the claimant is entitled to recover $1,250 on fifteen engines, pushed by the government order beyond the period at which they would have been delivered in the regular course of business, which amounts to. $18,750 Loss in settlement with the G-alena and Chicago Railroad Company.. 5,000
Total... 23, 750
For this sum ($23,750) judgment will he entered.